

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: | ) |
| GORDON PROPERTIES, LLC, and | ) |
| CONDOMINIUM SERVICES, INC., | ) |
| | ) |
| Debtors | ) |
| | ) |
| ——————————————————— | ) |
| FIRST OWNERS ASSOCIATION OF | )   1:12cv394  (LMB/TRJ) |
| FORTY SIX HUNDRED CONDOMINIUM | ) |
| INC., | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| GORDON PROPERTIES, LLC, and | ) |
| CONDOMINIUM SERVICES, | ) |
| | ) |
| Appellees. | ) |

## MEMORANDUM OPINION

Before the Court is an appeal by First Owners' Association

of Forty Six Hundred Condominium, Inc. (the "Association" or

"appellant")[1] of the bankruptcy court's denial of its motion for

substantive consolidation, in which the Association sought to

consolidate the Chapter 11 petitions of Condominium Services,

Inc. ("CSI") and its parent company, Gordon Properties, LLC

("Gordon Properties")(collectively, "appellees"). For the

reasons that follow, the decision of the bankruptcy court will

---

[1] The Association is referred to as "FOA" in some documents.

be reversed and remanded for reconsideration in light of this Memorandum Opinion.

## I.   BACKGROUND

This case involves three entities that have spent significant time and money litigating in numerous fora since at least 2006. Their various claims have been heard by the Virginia state courts, the bankruptcy court in this district, at least one arbitrator, several district judges, and the Fourth Circuit. All these disputes center on a property located at 4600 Duke Street in Alexandria, Virginia, known as the Forty Six Hundred Condominium (the "Condominium"), a high-rise building built in 1975 by Bryan Gordon. Containing over 400 units, the Condominium consists of middle-to-low-income residential units as well as approximately 40 commercial units. Appellant's Br. at 8. The property also includes two street-level commercial "pad" sites, one occupied by a gas station and the other by a restaurant. Appellees' Br. at 1. The Association, a Virginia nonstock corporation, is the unit owners' association under the Virginia Condominium Act, Va. Code Ann. § 55-79.39, et seq. E.g., First Owners' Ass'n of Forty Six Hundred Condo., Inc. v. Gordon Props., 470 B.R. 364, 366-67 (Bankr. E.D. Va. 2012); Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc., 281 Va. 561, 566 (2011).

After Bryan Gordon completed construction of the Condominium, he created appellee CSI, a Virginia corporation, to manage the property. Bryan Gordon's unexpected death in 1978 led to the placement of his assets, including approximately 40 Condominium units and ownership of CSI, into a trust for the benefit of his four grandchildren: Bryan Sells, Brandy Sells, Lindsay Wilson and Julia Langdon. In 2002, appellee Gordon Properties was formed "to receive certain assets from the Bryan Gordon, Jr. Trust." Appellant's Br. at 6. The four grandchildren are the sole members of Gordon Properties. CSI has been a wholly-owned subsidiary of Gordon Properties since that time but was operated by a trustee until he was removed from his post in 2005 amid evidence of financial improprieties. Appellees' Br. at 2. Bryan Sells, the managing member of Gordon Properties, became CEO of CSI after the trustee's removal. His cousin Lindsay Wilson served as CSI's president from 2003 to 2010.[2]

In July 2006, the Association's board of directors notified CSI that its management contract was terminated after 27 years

---

[2] In addition to being the CEO of CSI and manager of Gordon Properties, Bryan Sells is now also president of the Association. See First Owners' Ass'n of Forty Six Hundred Condo., Inc. v. Gordon Props., No. 1:11cv1060, Dkt. No. 55 (E.D. Va. filed Sept. 30, 2011)(Ellis, J.). This development is a result of new members being seated on the Association's board of directors pursuant to an order of the bankruptcy court. See Dkt. No. 15. The new board has established a special litigation committee in an attempt to reduce conflicts of interest.

of service. CSI refused to recognize this termination, and the resulting dispute prompted multiple lawsuits between the parties in state court, three of which are relevant to this appeal. The first of the three relevant cases was filed by Gordon Properties in 2006 in the Circuit Court for the city of Alexandria. In this 2006 case, Gordon Properties sued the Association, alleging that the termination of CSI violated the Association's bylaws. Appellant's Br. at 15. The court rejected Gordon Properties' reading of the bylaws and granted summary judgment in favor of the Association. Condo. Servs., Inc., 281 Va. at 580 n.3.[3]

Meanwhile, after the Association's board terminated CSI, CSI continued collecting its management fees. To accomplish this, Bryan Sells wrote to the Condominium unit owners and instructed them to continue sending their payments to CSI while his cousin Lindsay Wilson, then CSI's president, opened a new bank account under the Association's name to receive those

---

[3] Gordon Properties' counsel in that case failed to timely notice an appeal, rendering the circuit court judgment the final decision. See In re Gordon Props., No. 09-18086, Dkt. No. 379 (hereinafter, "Hearing Tr."), at 170:3-24 (Bankr. E.D. Va. filed Oct. 2, 2009). The law firm that represented Gordon Properties was presumably not paid following its failure to comply with the limitations period because it is listed as a creditor in the Gordon Properties' bankruptcy. Id. It has not filed a proof of claim. R. at 209.

payments. See, e.g., R. at 282-85.[4] Lindsay Wilson was assisted by CSI's accountant, who falsely represented that she was the Association's secretary. See, e.g., id. at 284; see also Appellant's Ex. 6 (email titled "new account for FOA" from CSI accountant to Bryan Sells). From those payments it received, CSI paid itself its management fees. In 2009, the Association sued CSI for breach of contract and conversion. First Owners' Ass'n of Forty Six Hundred Condo., Inc. v. Condo. Servs., Inc., No. CL09-1018 (Va. Cir. Ct. filed 2009)(hereinafter "Case CL09-1018").

CSI raised an affirmative defense that the Association's board lacked authority to terminate its management contract; however, the state court struck that defense based on the judgment in the 2006 case, and it granted summary judgment to the Association on the conversion claim after all of the evidence had been presented. Condo. Servs., Inc., 281 Va. at 571-74 (affirming circuit court's decision to strike and grant summary judgment). The jury awarded the Association $70,667 for breach of contract; $91,125 in compensatory damages plus

---

[4] Citations to the record refer to the electronic page numbers of the combined documents — specifically, the notice of appeal and three related attachments — found at the first entry on the docket sheet in this case. Citations to "Appellant's Ex." refer to appellant's exhibit book [Dkt. No. 2], which was originally produced for the August 22, 2011 evidentiary hearing before the bankruptcy court.

$275,000 in punitive damages for the conversion; and $11,390 in prejudgment interest. Id. at 580-81 (upholding judgment); Appellant's Reply at 6. The judgment is the basis for the Association's proof of claim against CSI in the bankruptcy proceeding.

Around the same time that it terminated CSI as its property manager in 2006, the Association determined that the commercial pad site occupied by the restaurant and owned by Gordon Properties had been under-assessed for several years, and it proceeded to levy an increased assessment. In response, Gordon Properties filed a multi-count lawsuit in 2008 challenging, among other things, the Association's assessment of the site. Gordon Props., LLC v. First Owners' Ass'n of Forty Six Hundred Condo., Inc., No. CL08-1432 (Va. Cir. Ct. filed 2008)(hereinafter, "Case CL08-1432"). On January 15, 2009, the Association counterclaimed for breach of contract and for an accounting. R. at 136-42 (amended counterclaim).[5] In addition to seeking certain storage fees and assessments from Gordon Properties, appellant alleged that Gordon Properties "owes the Association $96,000 in assessments which it diverted to CSI and

---

[5] The counterclaim was against Gordon Properties alone; CSI was not a party to Case CL08-1432. Records from the relevant state court proceedings show appellant to be correct that "there was never a lawsuit involving both Gordon Properties and CSI." Appellant's Reply at 2.

never paid the Association." Id. at 138 ¶¶ 13-14. Neither party ultimately prevailed on any issue: Gordon Properties' eight claims were either stricken by the court or rejected by the jury, the jury found for Gordon Properties on the Association's counterclaim for breach of contract, and the court struck the Association's request for an accounting. R. at 81-85 (Judge Kemler's July 27, 2009 final order). The Association did not appeal, and the Virginia Supreme Court did not accept Gordon Properties' petition for appeal. Appellant's Br. at 18 n.8.

On October 2, 2009, Gordon Properties filed a petition for bankruptcy under Chapter 11, listing four creditors. R. at 178.[6] On January 29, 2010, the Association filed a proof of claim in the amount of $315,673.36 for alleged under-assessments on Gordon Properties' restaurant for the period from 2003 to 2008.[7] "According to its schedules, even if all [four creditors'] claims are allowed, Gordon Properties has net equity of about $9,600,000." R. at 180. CSI filed a bankruptcy petition under Chapter 11 on January 26, 2011. It scheduled one creditor, the

---

[6] Specifically, the Association and Burke & Herbert Bank and Trust Co., which holds the deeds of trust on certain Condominium units, were listed as secured creditors. See In re Gordon Props., No. 09-18086, Dkt. No. 1, at 16, 19-20. Additionally, two law firms were listed as unsecured creditors. Id.; see supra n.3.

[7] On August 23, 2012, the bankruptcy court disallowed the claim. In re Gordon Props., No. 09-18086, Dkt. No. 424.

Association, which filed a proof of claim in the amount of $453,533.12, based on the judgment in Case CL09-1018 plus interest. A proof of claim was also filed by the IRS for $1,955.45. "According to [CSI's] schedules, if both claims are allowed, it has a net deficit of about $426,000." Id.

On September 29, 2010, an order was entered granting appellees' motion for joint administration of the two bankruptcy estates and permitting Gordon Properties to continue making capital contributions to CSI. Id. at 11. The two bankruptcies were thereafter administratively consolidated. After the Association filed a motion for substantive consolidation, the bankruptcy court held a one-day evidentiary hearing and subsequently denied the motion in a memorandum opinion issued on February 8, 2012. Appellant timely noticed this appeal.[8]

## II.   DISCUSSION

Substantive consolidation, having no express statutory basis, is a construct of federal common law and emanates from equity. In re Owens Corning, 419 F.3d 195, 205 (3d Cir. 2005); Sav. Bank v. Augie/Restivo Baking Co. Ltd. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 (2d Cir. 1988). "No court has

---

[8] Since the filing of this appeal, Judge Ellis, in a separate appeal by the Association from the bankruptcy court's order in an adversary proceeding, has sua sponte ordered the Association and Gordon Properties to brief the issue of whether Gordon Properties filed its bankruptcy petition in bad faith. See First Owners' Ass'n, No. 1:11cv1060, Dkt. No. 54.

held that substantive consolidation is not authorized, though there appears nearly unanimous consensus that it is a remedy to be used sparingly." In re Owens Corning, 419 F.3d at 208-09 (citations, footnote, and internal quotation marks omitted). Its "sole purpose . . . is to ensure the equitable treatment of all creditors." In re Augie/Restivo Baking Co., 860 F.2d at 518.

Substantive consolidation "treats separate legal entities as if they were merged into a single survivor . . . . The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor." In re Owens Corning, 419 F.3d at 205 (internal quotation marks omitted). In the process, "liabilities of consolidated entities inter se are extinguished by the consolidation." Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), 810 F.2d 270, 276 (D.C. Cir. 1987).

Challenging the bankruptcy court's denial of its motion for substantive consolidation, appellant argues that the bankruptcy court's factual findings were clearly erroneous and that its legal analysis improperly ignored Stone v. Eacho (In re Tip Top Tailors, Inc.), 127 F.2d 284 (4th Cir. 1942), which appellant contends requires courts in this district to apply the equivalent of corporate veil-piercing analysis to motions for substantive consolidation. Appellees respond that the bankruptcy

9

court applied the correct law in this case and that consolidation is unwarranted under any test.

## A. Standard of Review

Pursuant to 28 U.S.C. § 158(a), a district court has jurisdiction to consider appeals from final judgments, orders, and decrees of a bankruptcy court, including orders resolving motions for substantive consolidation. In re Bonham, 229 F.3d 750, 761-62 (9th Cir. 2000)(holding that substantive consolidation orders are final and appealable); see, e.g., In re Owens Corning, 419 F.3d at 204 (holding that "[a]ll four [Third Circuit] factors weigh heavily in favor of . . . jurisdiction to consider the appeal" pursuant to 28 U.S.C. § 1291 "of an order granting substantive consolidation"); In re Augie/Restivo Baking Co., 860 F.2d at 516-17 (proceeding to merits on substantive consolidation order).

A district court sitting as an appellate court in a bankruptcy proceeding reviews the lower court's conclusions of law de novo. See In re Merry-Go-Round Enters., Inc., 400 F.3d 219, 224 (4th Cir. 2005)(citing Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Inc.), 167 F.3d 843, 847 (4th Cir. 1999)). Factual findings of the bankruptcy court are reviewed for clear error. Id.; Fed. R. Bankr. P. 8013. Findings of fact will be overturned as "clearly erroneous" if consideration "of

the entire record leaves [the reviewing court] with the definite and firm conviction that a mistake has been committed." Harmon v. Levin, 772 F.2d 1150 (4th Cir. 1985). "[D]ue regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013.

Finally, decisions committed to the discretion of the bankruptcy court are reviewed for abuse of discretion. Robbins v. Robbins (In re Robbins), 964 F.2d 342, 345 (4th Cir. 1992); see In re Permian Producers Drilling, Inc., 263 B.R. 510, 517 (W.D. Tex. 2000)("Because it is an exercise of a bankruptcy court's equitable power under section 105(a), an order for substantive consolidation is reviewed for abuse of discretion.")(citations omitted).

## B. Standing

Appellees argue in passing that the Association, as a creditor rather than the trustee or debtor-in-possession, lacks standing to pursue a motion for consolidation based on a veil-piercing theory. See Appellees' Br. at 13-14 (citing Steyr-Daimler-Puch of Am. Corp. v. Pappas, 852 F.2d 132 (4th Cir. 1988)).[9] Appellant responds that appellees are precluded from challenging standing because they did not present the argument to the bankruptcy court and are therefore raising it for the

---

[9] Gordon Properties has remained a debtor-in-possession in its bankruptcy.

first time on appeal. Appellant is incorrect as a matter of law. Standing is an aspect of subject matter jurisdiction and not subject to waiver. See FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 230-31 (1990).

Appellees' substantive argument is nevertheless unpersuasive in light of numerous well-reasoned cases finding that creditors have standing to pursue substantive consolidation. See In re Lahijani, No. 02-01797, 2005 WL 4658490, at *4 n.41 (Bankr. C.D. Cal. Oct. 3, 2005)(collecting cases). Steyr, cited by appellees, is not to the contrary. The court there held that an alter ego cause of action is the property of the bankruptcy estate under 11 U.S.C. § 541(a), and it was therefore held by the trustee. 852 F.2d at 135-36. Steyr did not involve a motion for substantive consolidation under the bankruptcy court's equitable powers, and nothing in its reasoning compels the extension of its holding to such motions. The Court will, therefore, consider this appeal on its merits.

## C. The Association's Motion for Substantive Consolidation

The parties disagree about what law governs appellant's motion and whether the bankruptcy court's factual findings were clearly erroneous.

### 1. The Bankruptcy Court's Legal Conclusions

The Association argues that the bankruptcy court ignored

the binding precedent in Stone. In that case, the Fourth Circuit reversed the lower court's refusal to consolidate the bankruptcy estates of a parent corporation with its subsidiary, finding that substantive consolidation was appropriate given the insolvency of the two corporations, the lack of adherence to corporate forms such that the subsidiary had no separate existence, and the likelihood that creditors transacting business with the subsidiary believed they were dealing with the parent corporation. Stone, 127 F.2d at 287-88, 290.[10] These circumstances justified allowing the creditors of both corporations to share equally in the pooled assets of the two corporations. Id. at 288.

Although Stone did not set forth a specific test for substantive consolidation, its general approach of focusing on equity to creditors and refusing to "be blinded by corporate forms," has been widely noted and followed. See, e.g., In re Vecco Constr. Indus., Inc., 4 B.R. 407, 408-09 (Bankr. E.D. Va. 1980)(granting debtors' motion to substantively consolidate the bankruptcies of a parent corporation and four wholly owned

---

[10] The Court of Appeals decided Stone on the heels of Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215 (1941), in which the Supreme Court affirmed "an order consolidating the estates" in bankruptcy on the grounds that "[m]ere legal paraphernalia will not suffice to transform into a substantial adverse claimant a corporation whose affairs are so closely assimilated to the affairs of the dominant stockholder that in substance it is little more than his corporate pocket." Id. at 218.

13

subsidiary corporations where accounts were largely intertwined, the parent had assumed the assets and liabilities of the subsidiaries, the corporations shared directors and office space, and no creditor would be harmed by consolidation);[11] see also, e.g., In re Cyberco Holdings, Inc., 431 B.R. 404, 416 (Bankr. W.D. Mich. 2010)(observing that of the early consolidation cases, Stone "is certainly the one most akin to a modern court's notion of substantive consolidation").

The Fourth Circuit has not had occasion to revisit the standard for deciding motions to consolidate, but since Stone, two other circuits have developed specific tests governing such motions. Explaining that substantive consolidation is a remedy for which the "sole purpose . . . is to ensure the equitable treatment of all creditors," the Second Circuit identified "two

---

[11] Although In re Vecco did not cite Stone, the consolidation criteria it recognized are similar to the considerations set out by the Fourth Circuit:

> First, the degree of difficulty in segregating and ascertaining individual assets and liability. Second, the presence or absence of consolidated financial statements. Third, the profitability of consolidation at a single physical location. Fourth, the commingling of assets and business functions. Fifth, the unity of interests and ownership between the various corporate entities. Sixth, the existence of parent and inter-corporate guarantees on loans. Seventh, the transfer of assets without formal observance of corporate formalities.

4 B.R. at 410.

critical factors" in assessing a motion for consolidation: "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." In re Augie/Restivo Baking Co., 860 F.2d at 518 (emphasis added) (internal quotation marks and citations omitted). Under the burden-shifting test devised by the D.C. Circuit, a party seeking consolidation "must show not only a substantial identity between the entities to be consolidated, but also that consolidation is necessary to avoid some harm or to realize some benefit." In re Auto-Train Corp., 810 F.2d at 276. If the party meets its initial burden but a creditor thereafter objects to consolidation on the grounds that it would be prejudiced, "the court may order consolidation only if it determines that the demonstrated benefits of consolidation heavily outweigh the harm." Id. (internal quotation marks omitted)(requiring courts to "conduct a searching inquiry to ensure that consolidation yields benefits offsetting the harm" inflicted).[12]

---

[12] The Third, Sixth, and Ninth Circuits have adopted the Augie/Restivo test, while the Eighth and Eleventh Circuits use the Auto-Train test, or a variation on it. At least one Second Circuit case cites to Auto-Train, without suggesting that Augie/Restivo has been in any respect abrogated. See FDIC v. Colonial Realty Co., 966 F.2d 57, 61 (2d Cir. 1992).

Without explaining why he chose not to follow Stone, or elaborating on why application of In re Augie/Restivo was appropriate in this case, the bankruptcy judge concluded that "the Augie/Restivo test is generally preferred over the Auto-Train test." R. at 185. The bankruptcy court rejected the Association's argument for consolidation as "favor[ing] factors more appropriately considered in an action to pierce the corporate veil rather than a motion for substantive consolidation. The tests are different." Id. at 186. He then found no basis for consolidation under In re Augie/Restivo because "CSI and Gordon Properties properly and clearly maintained their separate identities," there were "no accounts to unravel" post-petition, and "there is no evidence that any creditor . . . was confused about the identity of the company with which it was dealing. Id. at 185-86.

The bankruptcy court's opinion failed to fully evaluate equitable considerations, despite Stone's clear teaching that it is "well settled that courts will not be blinded by corporate forms nor permit them to be used to defeat public convenience, justify wrong or perpetrate fraud . . . ." 127 F.2d at 288. Instead, courts "will look through the forms . . . as justice may require." Id. This focus on fairness also permeates the decisions of courts after Stone. See, e.g., Eastgroup Props. v.

S. Motel Ass'n, Ltd., 935 F.2d 245, 249 (11th Cir. 1991)("[T]he basic criterion by which to evaluate a proposed substantive consolidation is whether the economic prejudice of continued debtor separateness outweighs the economic prejudice of consolidation.")(internal quotation marks and citation omitted); In re Vecco, 4 B.R. at 409-10 (assessing motion based on rights of the creditors and observing a "liberal trend in allowing consolidation of proceedings" which "arises from . . . increased judicial recognition of the widespread use of interrelated corporate structures by subsidiary corporations operating under a parent entity's corporate umbrella for tax and business planning purposes")(citing Soviero v. Nat'l Bank of Long Island, 328 F.2d 446, 448 (2d Cir. 1964)).[13] Appellees argue that Stone "is of little to no consequence in determining the propriety of the substantive consolidation remedy because the evolution of

---

[13] Many courts that have applied the Augie/Restivo test have to some degree recognized the Stone focus on equity, suggesting that the two cases may not be inherently incompatible, as the parties appear to believe. See, e.g., In re Owens Corning, 419 F.3d at 205 (finding that the reasons "for allowing substantive consolidation as a possible remedy span the spectrum and often overlap. For example, Stone and Soviero followed the well-trod path of alter ego analysis in state 'pierce-the-corporate-veil' cases."); cf. William H. Widen, Corporate Form and Substantive Consolidation, 75 Geo. Wash. L. Rev. 237, 269 n.102, 272-73 (2007)(disagreeing with the analytical approach in In re Owens Corning but acknowledging that "the economic efficiency rationale and the veil piercing rationale for substantive consolidation coexist" and that courts frequently combine the elements).

the law on this question has passed it by." Appellees' Br. at 15. To the contrary, Stone is not only good law, and binding precedent in this circuit, it fits comfortably within the current case law.

The Stone approach is particularly appropriate here. Specifically, in both bankruptcies, the Association is the sole active creditor, and not even appellees argue that any creditor would be harmed by consolidation.[14] Absent consolidation, the Association, which has a valid state court judgment for compensatory and punitive damages, will be unlikely to collect because CSI lists no assets. Were its and Gordon Properties' estates consolidated, the single combined estate would be sufficient to pay the claims of all the creditors in both bankruptcies. In fact, Gordon Properties would have $9 million in scheduled assets left after the claims of the consolidated creditors were paid. R. at 180.

---

[14] In fact, appellant represented to the bankruptcy court that one of Gordon Properties' law firm creditors joined the motion for substantive consolidation. R. at 209 (footnote). The absence of any harm to or objection by other creditors is significant given that the reason courts grant substantive consolidation "sparingly" is their fear of subordinating the rights of creditors. See Colonial Realty Co., 966 F.2d at 61 ("[T]his Court has insisted that substantive consolidation be invoked 'sparingly because of the possibility of unfair treatment of creditors.'" (quoting Chem. Bank N.Y. Trust Co. v. Kheel, 369 F.2d 845, 847 (2d Cir. 1966))).

Equity also points toward consolidation because the same individuals who controlled CSI when it was found liable for conversion run Gordon Properties. In the letter that Bryan Sells sent to Condominium unit owners, which launched the conversion scheme, he identified himself as a representative of both debtors. See Appellant's Ex. 5. The record created by the bankruptcy court's August 22, 2011 evidentiary hearing clearly established that Gordon Properties and CSI are controlled by the same individuals and that over the last few years, Gordon Properties has given CSI approximately $900,000, without an established protocol or proper record-keeping, to cover CSI's expenses, payroll, and litigation costs. See Hearing Tr. at 51:2-23 (Q:"On how many occasions [during the last five years did Gordon Properties decline to provide funds requested by CSI]?" A:"It doesn't happen very often. A handful."),[15] 58:18-24 (Bryan Sells testifying that he knows of no document setting forth all the transfers from Gordon Properties to CSI), 64:15-20 (Bryan Sells recollecting that the amount of Gordon Properties'

---

[15] Unless otherwise stated, quotes from the evidentiary hearing are Bryan Sells' responses to questions from the attorney then representing the Association.

"paid-in capital" to CSI exceeds $900,000).[16]

These payments to CSI began before it engaged in the conversion[17] and continued after Gordon Properties filed for bankruptcy. See, e.g., id. at 57:2-24 (Q:"As you sit here today, you can't remember why $77,000 was transferred from Gordon Properties to CSI when Gordon Properties was already in bankruptcy?" A:"That's correct.").[18] During his testimony, Sells, a Harvard-trained lawyer, was unable to say in which capacity he was functioning – as Gordon Properties' managing member or as CSI's CEO – when making these various financing decisions. See

---

[16] According to appellant, Gordon Properties provided nearly $400,000 to CSI between April 2008 and January 2011 for payroll, operating expenses, and litigation costs, and $138,000 of that money was paid between October 2009 and February 2010. Hearing Tr. at 24:19-25:8.

[17] With respect to whether there is a nexus between the allegedly improper control by Gordon Properties and CSI's conversion, appellant argues that because CSI required Gordon Properties' financial support before the conversion began, Gordon Properties directly benefitted from the management fees CSI paid itself because these fees lessened Gordon Properties' support obligations.

[18] The Court is not moved by appellees' argument that its years of loans were eventually converted into capital contributions. Although this restructuring was certainly not legally improper, and there is no suggestion it was not fully compliant with applicable regulation, a post hoc decision to re-categorize these undocumented loans as capital contributions does not resolve whether appellees observed corporate formalities when the payments were made. Moreover, there is evidence in the record that years of inadequate documentation by appellees was a primary reason their accountant recommended converting the loans into capital contribution. See Hearing Tr. at 129:22-130:130:9.

id. at 41:13-44:22 (Q:"When you're [deciding whether to approve a CSI expense request] are you doing that in a dual role as . . . CEO of CSI and . . . managing member . . . at Gordon Properties?" A:"I haven't really given that much thought. I don't know."). The evidence presented to the bankruptcy court clearly showed that "corporate formalities were not followed with respect to the transfer of in excess of $900,000." Appellant's Br. at 10 (internal quotation marks omitted). Additionally, CSI uses office space owned by Gordon Properties without a rental agreement.[19] Hearing Tr. at 49:15-50:11. In fact, no written agreements exist that define the business relationship between appellees, despite CSI's management of all Gordon Properties' assets. Id.

Despite these facts favoring the Association's position, the bankruptcy court found that the two entities' separate bank accounts and separate tax returns undercut the Association's

---

[19] Although it is the purview of the lower court to make credibility findings, Bryan Sells' inconsistent testimony with respect to whether CSI's management fee included rent to Gordon Properties cannot be ignored. Compare Hearing Tr. at 45:25-46:11 ("I don't believe [CSI] has paid anything more than a nominal rent on occasion."), with id. at 140:18-22 (responding to his own attorney's question asking whether the office space "factor[s] in at all in determining what the amount of the management fee is?" with "It's inclusive in the management fee. Yes."). His assertion that the blatant discrepancies in his answers are attributable to his never having been explicitly asked whether rent was included in the management agreement is unavailing. Id. at 178:16-181:19.

motion for consolidation. R. at 181. It observed that the two corporations are engaged in different businesses, that CSI at one time managed other condominium associations, and that there is no evidence that any creditor of the two entities was confused about the identity of the corporation with which it was dealing. Id. at 186. It also referenced testimony by Bryan Sells that his hopes for CSI's post-litigation business prospects justified Gordon Properties' investment in its subsidiary. All the above-referenced facts are properly considered on remand in an analysis of the equities pursuant to Stone.

### 2.   The Bankruptcy Court's Factual Findings

In addition to the bankruptcy court's failure to fully consider the equities and other relevant facts in light of Stone, it accorded significant weight to a factual finding that is erroneous. Specifically, the bankruptcy judge incorrectly believed that both appellees were at some point parties in the same state court case and that the state court passed on whether Gordon Properties should be liable for CSI's conduct: "Ultimately, in a suit in which the condominium association sought relief against both CSI and Gordon Properties, the state court found in favor of the condominium association against CSI, but against the condominium association and in favor of Gordon

Properties which was dismissed from the case." Id. at 181.[20] This misunderstanding of the state court record led the bankruptcy judge to conclude that "[s]ubstantive consolidation would provide the [Assocation] with a remedy it was denied in state court." R. at 187. He characterized this statement, with which his analysis both begins and ends, as "a final, relatively unique consideration" and ultimately concluded that the "elements supporting substantive consolidation are not sufficiently present in this case." Id. at 182, 187.

A careful review of the state court proceedings reveals that the bankruptcy judge's view of the record is mistaken. As discussed in Section I, CSI and Gordon Properties were never

---

[20] The memorandum opinion continued:

> The [A]ssociation sued both CSI and Gordon Properties. The court found in favor of Gordon Properties. The efforts of the [A]ssociation to reach the assets of Gordon Properties under state law were unsuccessful. But that is exactly what it seeks to do here. In this case, it would be inappropriate to allow the [A]ssociation to conduct an end run around the prior adverse state court determination.

Id. at 187; see also Hearing Tr. at 147:7-148:2. This same misunderstanding was reflected in the bankruptcy judge's most recent opinion disallowing the Association's proof of claim in Gordon Properties' bankruptcy: "One suit involved a claim by the [A]ssociation against both CSI and [Gordon Properties]. It was tried before a jury which found for the [A]ssociation against CSI but not against [Gordon Properties]." In re Gordon Props., No. 09-18086, Dkt. No. 423, slip op. at *9 (Bankr. E.D. Va. Aug. 23, 2012).

named together as parties in any of the state court lawsuits
relevant to this appeal. In Case CL08-1432, litigation in which
neither side was successful, Gordon Properties sued the
Association in connection with the Association's assessment of
Gordon Properties' restaurant site, and the Association
counterclaimed for breach of contract and an accounting. CSI was
not a party to this litigation. In Case CL09-1018, the
Association sued CSI for breach of contract and conversion and
prevailed; Gordon Properties was not a party to this lawsuit.

Appellees do not acknowledge the bankruptcy court's factual
error or clarify the record. See Appellees' Br. at 5, 12-13.
Instead, arguing res judicata,[21] they maintain that the amended
counterclaim and trial transcripts in Case CL08-1432 show that
"the issue of control of CSI by Gordon Properties was . . . the
precise issue on which the liability of Gordon Properties for
conversion by CSI of the $91,125 dollars in management fee was
pled and pursued in the 2008 State Court litigation." Appellees'
Br. at 16. This argument is flawed for several reasons.

First, the language of the Association's amended
counterclaim in Case CL08-1432 does not establish that an alter
ego claim or theory was pursued:

---

[21] Appellees framed the question as one of collateral estoppel
before the bankruptcy court but argue on appeal that the
doctrine of res judicata applies. Compare Hearing Tr. at 8:21-
10:9, 15:11-23, with Appellees' Br. at 15-19.

> Between August of 2006 and December of 2007, Gordon [Properties] caused CSI to pay itself approximately $96,000 in so called "management fees," although CSI was no longer the management agent for the Association and provided no services to the Association. Gordon [Properties] owes the Association approximately $96,000 in assessments which it diverted to CSI and never paid to the Association.

R. at 135 ¶¶ 13-14 (amended counterclaim). CSI was not named as

a party to the suit, and the amended counterclaim, read as a

whole and read against the trial transcripts, does not establish

that veil-piercing was litigated in Case CL08-1432.

Appellees argue that the trial transcripts and the court's

answer to a question from the jury support their position that

Gordon Properties' control over CSI was at issue. Id. at 149-76.

First, as Gordon Properties acknowledges, its chosen defense to

the breach of contract counterclaim was that it had paid its

contractually required assessments to CSI and had therefore

satisfied its obligations to the Association. See R. at 171; see

also Appellant's Br. at 26 ("Gordon Properties argued that CSI

was an agent of [the Association] and that Gordon Properties had

fulfilled its obligations by paying CSI."); Hearing Tr. at

12:21-13:8; R. at 173 (state court closing argument in which the

Association theorized that Gordon Properties directed its

assessments to CSI, thereby breaching its contract with the

Association, to "prop up" CSI).[22] That some details of the inter-relationship between appellees was elicited as a result of Gordon Properties' defense simply does not establish that an alter ego claim was actually litigated. Although it is impossible to discern the precise basis on which the jury rejected the Association's counterclaim from the record generated below and the parties' filings, one simply cannot surmise from appellees' presentation that substantive consolidation would result in "a remedy the Association was denied in state court." R. at 186.[23]

---

[22] Bryan Sells was questioned about this defense during his deposition testimony, which was played at trial:

> Q: The first ground of defense states the counterclaim is barred by the defense of payment. What is the . . . factual basis for that defense?
> A: [W]hat it refers to is Gordon Properties did, in fact, pay its assessments in full. And they were deposited into the [bank account created by CSI]. And, of course, that account has also been turned over.
> Q: But what was turned over didn't include monies that went out to CSI . . . . The assessments that you claim Gordon Properties paid into the account were not repaid to the association in full, were they?
> A: I see that as a matter between [the Association] and CSI.

Id.

[23] What complicates the record is that appellees, without explicitly admitting that CSI and Gordon Properties were never parties to the same case, now argue that the Association should have brought its veil-piercing claim in Case CL08-1432 pursuant to Va. Sup. Ct. R. 1:6, which requires a litigant to raise all claims arising from the "same conduct, transaction, or

Second, as both parties point out, during deliberations, the jury asked the court whether Gordon Properties, a party to the case, and CSI, a corporation discussed by the parties, were separate legal entities. R. at 178. Without consulting the parties on how the court should respond, the court instructed the jury that CSI and Gordon Properties were separate legal entities, which is a factually true statement. Id. at 177. Although failing to consult the parties may have been improper, the circuit court's decision to respond to the question does not establish that an alter ego theory was actually litigated in the case submitted to the jury for decision. See Appellees' Br. at

_____

occurrence" in a single suit or face preclusion. See Appellees' Br. at 15-19. In advancing this argument, appellees initially represented that the amended counterclaim in Case CL08-1432 was filed after the judgment awarding damages to the Association against CSI for conversion was issued in Case CL09-1018; however, the Association actually filed its amended counterclaim 11 months before it received the judgment against CSI. (Appellees corrected their misstatement at oral argument.) The Association argues that the chronology is significant because without an underlying judgment against CSI for conversion, it had no basis to seek a veil-piercing claim against Gordon Properties in No. CL08-1432 and therefore preclusion does not apply. See Appellant's Reply at 11-13. Although the Court does not agree that Dana v. 313 Freemason, 266 Va. 491, 499 (2003), stands for the proposition that a plaintiff cannot litigate a substantive claim and an alter ego claim in the same case, as appellant suggests, this dispute between the parties is not dispositive. Contrary to appellees' claim before the bankruptcy court, the Association did not pursue a veil piercing theory in any state case, and even if it could have done so, appellees cite no case law to support the proposition that res judicata should therefore bar a motion for substantive consolidation in a bankruptcy proceeding.

5.[24] Appellees have not shown that appellant is either precluded or estopped from seeking consolidation.

### III.   CONCLUSION

The bankruptcy court afforded heavy weight in its analysis to the state court proceedings; however, its characterization of those proceedings was clearly erroneous, which undermines the validity of the court's conclusion. Moreover, the court failed to address the applicability of Stone and weigh the equities. Accordingly, the decision of the bankruptcy court will be reversed and remanded. On remand, the bankruptcy court should re-evaluate his conclusions in light of an accurate understanding of the state court litigation; evaluate all the facts in light of Stone, or clearly explain why that case does not apply to the motion; and consider whether the equitable treatment of all creditors is best served by consolidation.

An Order reversing the bankruptcy court's decision and remanding it will be issued with this Memorandum Opinion.

Entered this _5th_ day of September, 2012.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

---

[24] Appellees argue that because the Association did not object to the trial court's ruling and "made no effort to challenge it on appeal," it should now be collaterally estopped from taking a position different from the trial court's. The trial court's ex parte response to the question from the jurors does not constitute the type of ruling that would collaterally estop the Association from litigating the issue.